Tracy A. Miller, SBN 015920
Douglas (Trey) Lynn, SBN 028054
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C., #00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 778-3700
Tracy.Miller@ogletreedeakins.com
Trey.Lynn@ogletreedeakins.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Vickie Guanzon, Individually and on Behalf of All Other Similarly Situated Current and Former Employees,<br><br>    Plaintiff,<br><br>vs.<br><br>Vixxo Corporation, a Maryland corporation,<br><br>    Defendant. | Case No. CV-17-1157-DWL<br><br>**DEFENDANTS' MOTION FOR DECERTIFICATION OF COLLECTIVE** |

Defendant Vixxo Corporation ("Vixxo") moves this Court for decertification of the collective conditionally certified by the Court on January 3, 2018. This motion is supported by the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Decertification is appropriate because, accepting Plaintiffs' testimony as true, Plaintiffs had significantly different job duties from one another, making collective treatment of this case not only infeasible, but virtually impossible. The key issue in this action is whether employees who worked as Team Leads for Vixxo were properly classified as exempt under the Fair Labor Standards Act ("FLSA"). During their employment as Team Leads with Vixxo, all Plaintiffs were classified as exempt under the

FLSA as either administrative or executive employees. To determine whether Plaintiffs were properly classified as exempt requires an examination into the job duties that each Plaintiff performed. Because Plaintiffs' job duties varied significantly, Plaintiffs are not similarly situated for purposes of evaluating their exempt status. Resolution of their claims would require individual summary judgment analyses or mini-trials for each Plaintiff, circumventing the purpose of a collective action.

## I.   RELEVANT PROCEDURAL HISTORY

Plaintiff Vickie Guanzon filed this lawsuit on April 18, 2017 on behalf of herself and other similarly situated current and former Team Leads (ECF No. 1). Plaintiff claimed that she and other putative class members were misclassified as exempt under the FLSA and were not paid for overtime hours worked. Plaintiff moved for conditional certification on June 6, 2016 (ECF No. 19). The Court granted Plaintiff's Motion for Conditional Certification in part on January 3, 2018 and certified a collective composed of "current and former 'Customer Service Team Leads' who were employed by Vixxo throughout the United States" (ECF No. 38).

## II.   FACTUAL BACKGROUND

Vixxo[1] is a facilities maintenance company that provides maintenance and strategic support services for various clients' facilities throughout the United States and Canada. Vixxo serves customers including convenience stores, retail establishments, grocery stores, and restaurants. Vixxo partners with over 150,000 service providers and technicians to service the needs of its customers. Vixxo operates across the United States and Canada and has served customers, such as PetSmart, 7-Eleven, Starbucks, McDonald's, and Bloomin' Brands, Inc. ("BBI"), among others.

In each of its service centers, Vixxo employs Customer Service Representatives ("CSRs") to handle routine requests for repairs or service from customers. When CSRs

---

[1] Vixxo was formed in 2013 through the merger of First Service Networks, Inc. and IPT, LLC d/b/a FM Facility Maintenance.

2

receive service requests from Vixxo's customers, they select service providers from preapproved lists and schedule service calls. CSRs also interface with customers and follow up to ensure that necessary repairs or services are completed. [*See* Morse Dep. at 43:14-21, Ex. 1.] CSRs have little discretion as to which service providers to choose and the cost of services. [*See Id*. at 48:3-8.]  CSRs are classified as nonexempt and are paid for any overtime worked. [*See* Dillard Dep. at 70:2-4, Ex. 2.]

Team Leads also work in each of Vixxo's service centers. The duties of Team Leads vary on an individual basis depending on the Team Lead's experience, location, and the customer to which they are assigned. Vixxo's Team Leads typically deal with only one customer. The needs and requirements of that customer often dictate the Team Leads' job duties, although job duties can vary for Team Leads working for the same customer. All Team Leads are salaried employees exempt from receiving overtime pay under the FLSA's administrative and/or executive exemptions.

## III.     LEGAL STANDARD

The FLSA allows Plaintiffs to sue on behalf of themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). To determine whether employees are similarly situated under the FLSA, District Courts within the Ninth Circuit generally follow a two-step approach. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109-1110 (9th Cir. 2018) (citations omitted); *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 925 (D. Ariz. 2010). At the first step, courts conditionally certify a collective action if the plaintiff presents "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Colson*, 687 F.3d at 925 (citations omitted). If the plaintiff meets this low burden, the potential members of the collective action are notified and presented the opportunity to opt-into the lawsuit. *Id*. At the second step, which takes place after notification and discovery, defendants may move to decertify the class, and the Court revisits whether the class members are similarly situated. *Id*. The second step requires the Court to take a more exacting look at the Plaintiffs' allegations and the record. *Campbell*, 903 F.3d at 1109.

3

In *Campbell*, the Ninth Circuit recently clarified the standard for establishing whether class members are similarly situated for decertification after the close of discovery. *Id.* at 1117. The *Campbell* Court explicitly rejected the ad hoc approach used by the majority of courts when deciding decertification, and instead held that collective treatment is appropriate only "to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims." *Id.* at 1114. What matters in a collective action "is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively to some resolution." *Id.* at 1115 (emphasis in original). "A 'collective' action in which, as a material matter, *no material dispute* truly could be heard on a collective basis would hardly be consistent with the FLSA's remedial purpose." *Id.* at 1115-1116 (emphasis added). At the decertification stage, the Court may consider "the practical consideration of manageability or efficiency that permeated prior district court FLSA certification jurisprudence" to the extent those considerations show that the collective mechanism is infeasible. *Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, No. 15-CV-04456-PJH, 2018 WL 6727825, at *6 (N.D. Cal. Dec. 21, 2018) (citing *Campbell*, 903 F.3d at 1117).

On a post-discovery motion for decertification, the Court will apply a summary judgment standard. *Campbell*, 903 F.3d at 1118. The standard is:

> a mid- or post-trial analogue to the test applied at summary judgment, which asks, pretrial, whether sufficient evidence exists to preclude a judgment as a matter of law because, viewing the competent evidence in the light most favorable to the nonmoving party, the trier of fact could properly find for the nonmoving party.

*Id.* Viewing the evidence in the light most favorable to Plaintiffs here, collective treatment is infeasible and the collective should be decertified.[2]

---

[2] For purposes of this motion only, Vixxo assumes Plaintiffs' testimony and other evidence to be true.

4

## IV. ANALYSIS

Collective treatment is infeasible here because most, if not all Plaintiffs performed job duties so different from one another as to require an individual exemption analysis either on summary judgment or at trial. *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161, at *4 (S.D.Cal. Apr. 22, 2008) ("When the ultimate issue of whether each employee was properly classified under the FLSA, the 'similarly situated' inquiry must be analyzed in terms of the nature of each . . . plaintiff's job duties").

To assess whether each Team Lead's claim can be effectively resolved on a collective basis, the Court must first consider the specific factual and legal questions that a factfinder must answer to determine each Team Lead's exempt status. *Marlo v. UPS, Inc.*, 639 F.3d 942, 948-49 (9th Cir. 2011) (affirming decertification of misclassification claims and stating that courts should consider nature of proof necessary to establish claims); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945-46 (9th Cir. 2009) (courts must consider a full range of factors that exemptions raise before deciding if claims can proceed on class basis). When determining whether employees are "similarly situated" in terms of job duties, courts will consider factors such as the job duties actually performed on a daily basis, the importance of the job duties performed, pay provisions, and whether any of the FLSA's exemptions might apply to members of the proposed collective. *Litty v. Merrill Lynch & Co.*, No. CV 14-0425 PA (PJWX), 2015 WL 4698475, at *7 (C.D. Cal. Apr. 27, 2015). "[T]he more dissimilar plaintiffs are and the more individuated [the employer's] defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either side – that is reached on the basis of purportedly representative evidence." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008).

For example, in *Hazelbaker v. Metro. Prop. & Cas. Ins. Co.*, the court decertified a collective action where the dispositive issue was whether the plaintiffs had engaged in outside sales activities. No. CV-13-08067-PCT-JJT, 2014 WL 5304911, at *2 (D. Ariz. Oct. 16, 2014). The court reasoned "that resolution of what seems likely to be the determinative issue for each of the various Plaintiffs' claims – whether they were

customarily and regularly engaged in outside sales activities – would require a series of individualized inquiries" which would require "multiple mini-trials." *Id*.

The same is true here. The determinative issue for each of the Plaintiffs' claims would require individualized inquiries into whether each Plaintiff exercised independent judgment and discretion with respect to matters of significance. While all the Team Leads were exempt, the primary job duties involving the exercise of discretion varied from person to person. For some Team Leads, the executive and hybrid exemptions would also need to be considered. Plaintiffs here have merely provided common questions while providing wildly different answers, making collective treatment of the case truly infeasible. *Campbell*, 903 F.3d at 1117 (a collective may be decertified where "conditions make the collective mechanism truly infeasible").

### A. **Administrative Exemption**

To qualify for the FLSA's administrative exemption, an employee must (1) earn not less than $455 per week; (2) have the primary duty of performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) have the primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. The parties do not dispute that all Plaintiffs met the salary requirement for the administrative exemption.

To meet the second requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The regulations further state:

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers . . . may be exempt.

29 C.F.R. § 541.201(c). The line between exempt administrative employees and nonexempt employees may be drawn by distinguishing between those who are engaged in the "running of the business and not merely . . . the day-to-day carrying out of its affairs." *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)

Plaintiffs' testimony confirmed that their primary duties involved performing office work directly related to the management or general business operations of Vixxo's customers. They were primarily responsible for ensuring that proper repairs were made to customers' facilities and equipment, such as McDonald's grills, 7-Eleven's Slurpee machines, PetSmart's fish tanks, and customers' plumbing and HVAC systems. [Morse Dep. at 74:3-8, Ex. 1; Fagen Dep. at 38:18-39:10, 52:2-4, 56:13-22, Ex. 3; Williams Dep. at 49:9-50:3, Ex. 4; Vierheller Dep. at 32:24-33:8, Ex. 5; Norgren Dep. at 57:3-59:24, 86:1-87:24, 89:7-13, Ex. 6; Vertucci Dep. at 30:11-31:4, Ex. 7; Guanzon Dep. at 76:10-21, 78:3-12, 88:2-9, Ex. 8.] Thus, they were integrally involved in performing work directly related to the general business operations of Vixxo's customers.

The critical question here is whether Plaintiffs' primary duties included the exercise of discretion and independent judgment with respect to matters of significance. Twelve of the thirty-seven Plaintiffs were deposed, and their testimonies differed significantly on fundamental job responsibilities and the discretion involved in performing them. Given these differences, individualized inquiries are necessary to determine whether each Plaintiff was properly classified as exempt, and collective treatment is infeasible.

  **1.**  **Approval of NTE Amounts**

Vixxo's customers contact Vixxo when they need repairs or facility services. CSRs take incoming calls from customers and then dispatch service providers to perform the needed repairs. Vixxo's customers set preapproved cost limits (known as a "not-to-exceed" or "NTE" amount) for all repairs. Service providers may complete repairs if the cost of the repair does not exceed the NTE amount. If a service estimate was more than the preapproved NTE amount, CSRs would escalate the calls to the Team Leads. CSRs had no authority to approve requests to exceed NTE amounts and did not have to exercise

1   independent judgment or discretion in handling calls involving NTE requests. [*See* Dillard
2   Dep. at 47:20-24, Ex. 2.]

3   When Team Leads received an escalation for an NTE request, they had to exercise
4   independent judgment and discretion to determine whether the requested expense was
5   appropriate. Multiple Plaintiffs testified that approving NTE requests was their primary
6   duty as Team Lead and that they had to use their own judgment and discretion to determine
7   whether to approve an NTE request, approve a lower amount than requested, or deny the
8   request. Brandi Bailey testified that she had to review information on repair requests to
9   determine whether to approve a request exceeding the NTE amount, and she would deny
10  the request if she thought it was too expensive. She believed those decisions greatly
11  affected the customers' businesses. [Bailey Dep. at 33:21-34:19, Ex. 9.] Similarly, Jennifer
12  Morse testified that she had to look at issues critically and analyze the time and parts
13  required to fix the problem before approving or denying an NTE request. [Morse Dep. at
14  66:4-23; 125:4-126:9, Ex. 1.] Both Darlandra Williams and Stephanie Urciuoli testified
15  that when they received NTE requests, they would research rates and prices for parts and
16  repair time and would then use their own judgment to determine whether the request was
17  appropriate. [Williams Dep. at 60:3-61:10, 92:7-10, Ex. 4; Urciuoli Dep. at 65:24-68:6, Ex.
18  10.] Monique Dillard also exercised discretion in approving NTE requests. [Dillard Dep.
19  at 48:13-49:7, Ex. 2.]

20  Deciding whether to approve an NTE request required the use of independent
21  judgment and discretion regarding matters of significance. Approving an NTE request that
22  was too high would cause customers to incur unnecessary expenses, while denying an NTE
23  request could cause a customer to lose sales due to an untimely or inadequate repair. The
24  duty of approving NTE requests meets the requirement for exercising independent
25  judgment and discretion with respect to matters of significance necessary for the
26  administrative exemption. *Gonzalez v. Batmasian*, 734 F. App'x 677, 680 (11th Cir. 2018)
27  (affirming jury verdict that plaintiff was properly subject to the administrative exemption
28  where one of her primary job duties was to approve major repairs); *Clark v. Shop24 Glob.,*

8

*LLC*, 77 F. Supp. 3d 660, 676 (S.D. Ohio 2015) (denying plaintiff's motion for summary judgment and finding that a question of fact existed on whether plaintiff was exempt under the administrative exemption where one of the job duties included approving payment of invoices); *Adams v. BSI Mgmt. Sys. Am., Inc.*, No. 1:11-CV-2914-ODE, 2013 WL 12145000, at *7 (N.D. Ga. Feb. 12, 2013), *aff'd*, 523 F. App'x 658 (11th Cir. 2013) (administrative exemption applied where one of employee's job duties was to approve and submit invoices and was responsible for client and vendor relationships).

However, some Plaintiffs claimed that they did not approve NTE requests. Plaintiffs Sean Salzarulo, Mark Fagen, and Christine Vertucci all testified that they could approve no amounts above the NTE limits set by Vixxo's customers. [Salzarulo Dep. at 46:23-47:10, Ex. 11; Fagen Dep. at 67:1-17, Ex. 3; Vertucci Dep. at 27:7-28:4, 32:5-12, Ex. 7.] Rather, they claimed that they had to obtain customer approval before authorizing any service beyond the preapproved amounts that also applied to CSRs. [*Id*.]

Notably, Daniel Dubek testified that while he worked as a Team Lead for the McDonald's team, he did not have NTE approval authority. However, when he moved to a different team for customer Rue21, he was given NTE approval authority and approved NTE requests. [Dubek Dep. at 55:19-56:8, Ex. 12.] NTE approval authority could also vary between Team Leads who worked for the same customer. For example, Jennifer Morse and Mark Fagen both worked on the PetSmart team, but Ms. Morse approved NTE requests while Mr. Fagen did not. Moreover, some Team Leads approved, without customer input, expenses beyond their own limits in emergency situations, whereas others testified they could not do this. [*See* Salzarulo Dep. at 47:11-48:19, Ex. 11; Urciuoli Dep. at 69:21-70:13, Ex. 10.]

The extent to which Team Leads had the responsibility of approving NTE requests beyond the preapproved amounts goes directly to whether Plaintiffs exercised independent judgment and discretion with respect to matters of significance. Because some Plaintiffs had this responsibility while others did not, individualized inquiries into each Plaintiff's

job duties are necessary to determine whether each Plaintiff was properly classified as exempt.

### 2.     Selecting or Replacing Service Providers

Sourcing and selecting vendors is another job duty that shows the exercise of discretion and independent judgment with respect to matters of significance. *See e.g. Tousignant v. Hahn*, No. 1:14-CV-2272-MHS, 2015 WL 12696103, at *6 (N.D. Ga. Oct. 13, 2015) (employee exercised discretion and independent judgment where she made recommendations regarding the selection of vendors and outside contractors). There was a significant split among the Plaintiffs about whether they assisted with sourcing new service providers. Plaintiffs Morse, Williams, Vierheller, Urciuoli, Dubek, Dillard, and Vertucci all testified that they would search for and research new service providers. [Morse Dep. at 100:10-101:12, 109:13-20, Ex. 1; Williams Dep. at 51:7-52:14, 87:10-88:8, Ex. 4; Vierheller Dep. at 39:21-40:15, Ex. 5; Urciuoli Dep. at 64:4-6, Ex. 10; Dubek Dep. at 62:2-63:4, Ex. 12; Dillard Dep. at 42:14 – 44:13, Ex. 2; Vertucci Dep. at 34:13-35:9, Ex. 7.] These Plaintiffs then made recommendations based on their research of which new service providers to sign up with Vixxo. [*Id*.] Plaintiffs Morse and Urciuoli also testified that they had discretion when choosing which existing service providers to use for service requests. [Morse Dep. at 101:13-16, 109:5-12, Ex. 1; Urciuoli Dep. at 64:4-6, Ex. 10.] This required them to use their independent judgment and experience to determine which service providers were best for the service request.

Plaintiffs Bailey, Salzarulo, Norgren, and Guanzon testified they were never involved in sourcing new service providers or in selecting service providers for service calls. [Bailey Dep. at 38:19-25, 47:23-48:5, Ex. 9; Salzarulo Dep. at 30:5-10, Ex. 11; Norgren Dep. at 118:10-119:11, Ex. 6; Guanzon Dep. at 115:6-12, Ex. 8.] These Plaintiffs claimed that service providers were automatically dispatched through Vixxo's computer system when a service request came in. They had no discretion in choosing which service provider to send on a particular service request. [*Id*.] They also testified that they were not

involved in sourcing new service providers because another department was responsible for finding new service providers. [*Id.*]

Some Team Leads also reviewed the performance of service providers and recommended that Vixxo replace underperforming service providers. Plaintiffs Bailey, Salzarulo, Morse, Urciuoli, and Vertucci all testified they performed this duty. [Bailey Dep. at 39:1-8, 50:1-5, Ex. 9; Salzarulo Dep. at 30:23-31:8, 40:24-41:6, Ex. 11; Morse Dep. at 101:2-12, Ex. 1; Urciuoli Dep. at 62:16-63:22, Ex. 10; Vertucci Dep. at 23:9-16; 32:18-33:22, Ex. 7.] Their recommendations to dismiss certain service providers were given considerable weight and thus demonstrated independent judgment and discretion even if they were not the ultimate decision makers. *Tousignant*, No. 1:14-CV-2272-MHS, 2015 WL 12696103, at *6; [*See e.g.* Bailey Dep. at 39:9-15, Ex. 9.] Plaintiffs Williams, Norgren, and Dubek testified that they could not recommend dismissing underperforming service providers, and never did so. [Williams Dep. at 120:1-14, Ex. 4; Norgren Dep. at 113:20-114:20, Ex. 6; Dubek Dep. at 63:14-64:25, Ex. 12.] This split highlights the differences in the Plaintiffs' job duties on a significant fact in the exemption analysis. For example, Plaintiffs Williams and Dubek were both responsible for sourcing new service providers, but did not have authority to recommend dismissing underperforming service providers. On the other hand, Mr. Salzarulo was not involved in sourcing new service providers, but recommended replacing service providers who were not performing well.

### 3. Expediting Service Requests

Some Plaintiffs testified that they used discretion and independent judgment in deciding whether to expedite certain service requests. This responsibility was significant to Vixxo's customers because it would determine how quickly repairs were made, often in critical emergency situations. Ms. Morse testified that she had to use her independent judgment on which work tickets to expedite, which involved analyzing the underlying problem and weighing the different options. [Morse Dep. at 114:17-115:10, Ex. 1.] Similarly, Plaintiffs Fagen, Dubek, and Dillard testified that they had to decide whether

certain situations required the service requests be expedited. [Fagen Dep. at 47:16-21, Ex. 3; Dubek Dep. at 53:15-17, Ex. 12; Dillard Dep. at 34:2-12, 36:17-37:5, Ex. 2.]

Plaintiffs Williams, Vierheller, Norgren, and Vertucci testified that they did not expedite service requests and each service request priority was set by Vixxo's system or by another department. [Williams Dep. at 47:2-4, Ex. 4; Vierheller Dep. at 54:20-25, Ex. 5; Norgren Dep. at 99:13-100:18, Ex. 6; Vertucci Dep. at 50:3-8, Ex. 7.] Ms. Guanzon testified that she could prioritize service calls, but had to obtain authority from her manager to do so. [Guanzon Dep. at 89:21-90:5, 99:1-100:11, Ex. 8.]

The ability to expedite service requests weighs in favor the administrative exemption because those Team Leads had to use discretion and independent judgment to determine which service requests to expedite. These decisions had a significant impact on the customers' businesses. Therefore, those Team Leads who performed this duty as part of their primary duty would be properly classified as exempt.

### 4. Receiving Quotes, Negotiating Rates, and Resolving Billing Disputes

The job duties of receiving quotes, negotiating rates with vendors, and/or resolving billing disputes support the employee being exempt under the administrative exemption. *See Bailey v. Alpha Techs. Inc.*, No. C16-0727-JCC, 2017 WL 4167929, at *6 (W.D. Wash. Sept. 19, 2017) (administrative exemption properly applied to employee whose role was to negotiate prices of materials that employer used to make its products); *Levy v. Remy Cointreau USA, Inc.*, No. 14-CV-20906-UU, 2014 WL 11369633, at *6 (S.D. Fla. Nov. 6, 2014), *aff'd*, 604 F. App'x 918 (11th Cir. 2015) (employee exercised discretion and independent judgment with respect to matters of significance by assisting with choosing venues and vendors and negotiating prices); Opinion Letter Fair Labor Standards Act (FLSA), 2008 WL 833151, at *1 (employees who placed orders and negotiated prices with vendors were properly classified as exempt under the administrative exemption).

Plaintiffs Salzarulo, Morse, Vierheller, Bailey, Dillard, and Fagen testified they were responsible for getting quotes from service providers. [Salzarulo Dep. at 56:7-9, Ex.

11; Morse Dep. at 102:3-14, Ex. 1; Vierheller Dep. at 87:23-88:8, Ex. 5; Bailey Dep. at 46:23-47:4, Ex. 9; Dillard Dep. at 46:20-47:4, Ex. 2; Fagen Dep. at 69:6-9, 81:17-22, Ex. 3.] If, in their judgment and discretion, a quote was too high, they could seek quotes from other vendors to ensure Vixxo's customers were not paying too much for the service. [*Id*.] Those listed above (except Ms. Vierheller) also negotiated rates with service providers. [*Id*.; Vierheller Dep. at 36:16-20, 88:4-8, Ex. 5 (testifying she did not negotiate rates).] On the other hand, Plaintiffs Williams, Dubek, Vertucci, and Guanzon did not obtain quotes from service providers or make any determinations about whether the prices being charged by service providers were too high. [Williams Dep. at 88:9-13, Ex. 4; Dubek Dep. at 67:4-68:13, Ex. 12; Vertucci Dep. at 22:3-5, 31:10-14, Ex. 7; Guanzon Dep. at 110:18-111:7, Ex. 8.]

Additionally, Plaintiffs Salzarulo, Morse, Vierheller, Urciuoli, Dillard, and Guanzon testified that they handled billing disputes, such as when customers were failing or refusing to pay service providers. [Salzarulo Dep. at 20:15-18, Ex. 11; Morse Dep. at 96:23-97:5, Ex. 1; Vierheller Dep. at 46:17-47:18, Ex. 5; Urciuoli Dep. at 44:11-45:22, 50:12-52:4, Ex. 10; Dillard Dep. at 50:3-51:2, 92:21-93:19, Ex. 2; Guanzon Dep. at 43:16-45:7, Ex. 8.] Mr. Salzarulo stated that he would investigate whether invoices were valid and had to use his independent judgment to determine whether clients had been overcharged. He would then make recommendations about whether Vixxo should pay any unpaid charges, and his recommendations were generally accepted. [Salzarulo Dep. at 20:21-26:10, Ex. 11.] None of the other Plaintiffs who gave depositions performed similar duties regarding billing disputes. [*See* e.g. Dubek Dep. at 68:14-17, Ex. 12.]

Some Plaintiffs had to use discretion and independent to obtain quotes, negotiate service provider rates and to resolve billing disputes, while other Plaintiffs did not perform those duties. These duties establish the applicability of the administrative exemption, but this issue must be examined on a case-by-case basis for all Plaintiffs because not all Team Leads performed these job duties (although they performed other exempt duties).

13

### 5. Coaching and Training CSRs

Providing training to other employees supports an employee being exempt under the administrative exemption. *See e.g. Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) (providing client training required exercise of discretion and independent judgment with respect to matters of significance); *Wade v. Werner Trucking Co.*, No. 2:10-CV-270, 2014 WL 1091707, at *18 (S.D. Ohio Mar. 18, 2014) (plaintiff who trained other employees was subject to administrative exemption); *Bernard v. Grp. Pub., Inc.*, 970 F. Supp. 2d 1206, 1225–26 (D. Colo. 2013) (employee who created training materials for training other employees was subject to the administrative exemption).

Plaintiffs Bailey, Salzarulo, Morse, and Urciuoli trained and coached CSRs and/or other Team Leads. [Bailey Dep. at 40:15-23, 52:4-53:8, Ex. 9; Salzarulo Dep. at 32:16-19, 37:11-14, 74:3-75:5, Ex. 11; Morse Dep. at 77:14-22, 82:24-83:10, 122:20-123:6, Ex. 1; Urciuoli Dep. at 76:14-77:11, 93:16-23, 96:2-97:3, Ex. 10.] Plaintiff Dillard put together a standard procedure book for CSRs and trained CSRs and Team Leads. [Dillard Dep. at 59:9-21, 59:21-60:13, Ex. 2.] Plaintiffs Dubek and Vertucci both mentored and assisted CSRs, but claim they did not train CSRs. [Dubek Dep. at 49:3-23, 53:8-11, Ex. 12; Vertucci Dep. at 43:11-44:14, Ex. 7.] Ms. Vierheller testified that she was part of Vixxo's training team, but that she rarely trained CSRs. [Vierheller Dep. at 52:7-53:24, Ex. 5.] Other Plaintiffs testified that they were not involved in training or mentoring other employees. [Fagen Dep. at 80:21-22, Ex. 3; Norgren Dep. at 81:3-82:10; 105:7-12, Ex. 6; Guanzon Dep. at 128:14-21, Ex. 8.]

Here, the Plaintiffs' job duties range from actively training CSRs and Team Leads, to providing mentoring but no formal training, to providing no training. Plaintiffs are not similarly situated in this respect. If this case continues as a collective action, the Court, and possibly a jury, must analyze whether each individual Plaintiff provided enough training and coaching to other employees to meet the administrative exemption, which is infeasible.

### 6. Influencing Policies and Procedures

Employees tasked with making recommendations to improve policies and procedures use discretion and independent judgment with respect to matters of significance. *See e.g. Bernard*, 970 F. Supp. 2d at 1225-26 (plaintiff properly classified as exempt where he "identified and promote[d] solutions . . . including making suggestions with the goal of increasing efficiency").

Once again, some Plaintiffs made recommendations to improve Vixxo's policies and procedures while others did not. Ms. Vierheller testified that she recommended changes to Vixxo's standard operating procedures. [Vierheller Dep. at 50:12-15, Ex. 5.] She was also part of a team responsible for coming up with a new onboarding plan and she worked on a mobile campaign, which involved suggesting improvements to Vixxo's mobile app based on comments from service providers. [*Id.* at 61:8-12, 65:9-66:8.] Mr. Norgren testified that he worked on Vixxo's mobile ninja program and made recommendations on how to improve the program. [Norgren Dep. at 107:21-109:11, Ex. 6.] Ms. Guanzon also made recommendations on how to develop new ways to streamline Vixxo's processes. [Guanzon Dep. at 144:15-145:5, Ex. 8.] Other Plaintiffs provided no recommendations that would influence Vixxo's policies and procedures. [*See* e.g. Dubek Dep. at 41:20-23, Ex. 12.]

### 7. Subject-Matter Expertise

Some Plaintiffs had to exercise discretion and independent judgment with respect to matters of significance as subject matter experts for Vixxo. *See Boaz v. Fed. Exp. Corp.*, 107 F. Supp. 3d 861, 894 (W.D. Tenn. 2015), *aff'd sub nom. Boaz v. FedEx Customer Info. Servs., Inc.*, 668 F. App'x 152 (6th Cir. 2016) (employee who acted as subject-matter expert on projects was properly classified as exempt under the administrative exemption). Plaintiffs Fagen, Vierheller, and Dubek all testified that they had to provide subject matter expertise. Mr. Fagen was Vixxo's fish tank expert for PetSmart and all fish tank-related calls would go to him. [Fagen Dep. at 45:1-10, Ex. 3.] His experience allowed him to make better judgment calls about how to repair any issues with fish tanks. Ms. Vierheller

provided subject matter expertise for 7-Eleven relating to fuel service centers and gas spills. [Vierheller Dep. at 47:22-48:15, Ex. 5.] Mr. Dubek gained expertise working for Vixxo's restaurant clients to where he could exercise judgment relating to repairs of restaurant equipment. [Dubek Dep. at 76:9-77:9, Ex. 12.] No other Plaintiffs testified that they provided this subject matter expertise. Thus, the Court cannot consider the matter of whether exercising subject matter expertise supports the administrative exemption on a collective basis.

### B. Executive Exemption

Some Plaintiffs are also exempt under the FLSA's executive exemption. The executive exemption applies to employees (1) whose weekly salary is not less than $455; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100.

Both Jennifer Morse and Stephanie Urciuoli testified that they had direct reports whom they supervised. Ms. Morse testified that she had three CSRs who reported directly to her. [Morse Dep. at 76:6-77:15, Ex. 1.] She assigned them tasks, approved their time sheets and requests for time off, and checked their work. [*Id.* at 71:25-72:4, 77:20-22, 103:17-24.] Ms. Morse also interviewed a candidate for a CSR position, made a recommendation on whether to hire the candidate, and was involved in disciplining the CSRs who reported to her. [*Id.* at 80:5-6, 110:7-112:22, 131:24-132:2.]

Similarly, Ms. Urciuoli had two facilities specialists[3] who reported directly to her, as well as a team of seven to ten CSRs. [Urciuoli Dep. at 72:23-73:24, 86:15-23, Ex. 10.]

---

[3] At this time, prior to the corporate merger mentioned earlier, Ms. Urciuoli's title with FM Facilities Management was lead facilities specialist, which was the equivalent position of

16

She directly supervised the employees who reported to her and did personnel evaluations for her CSRs. [*Id.* at 94:2-95:25.] She was involved in the hiring process and her recommendations were given weight by the ultimate decision-makers. [*Id.* at 74:16-18, 96:2-7.] She could also discipline her direct reports and offer input into whether to terminate them, which was given particular weight. [*Id.* at 75:16-78:17, 96:14-16.]

Many other Plaintiffs testified that they did not supervise other employees, interview potential candidates, or make recommendations on whether to hire or fire other employees. [Bailey Dep. at 52:18-22, Ex. 9; Salzarulo Dep. at 37:7-25, Ex. 11; Fagen Dep. at 39:6-10, 59:12-17, Ex. 3; Williams Dep. at 89:15-18, Ex. 4; Vierheller Dep. at 52:7-9, Ex. 5; Norgren Dep. at 71:19-73:3, Ex. 6; Vertucci Dep. at 44:10-14, Ex. 7; Guanzon Dep. at 128:11-21, Ex. 8.] Therefore, the executive exemption may not apply to those Plaintiffs. Plaintiffs cannot show they are all similarly situated for a collective action where such an exemption may apply only to some members of the class. Because multiple exemptions may apply here, even more "fact-intensive inquiries into how individual [Team Leads] performed their job" are required. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010), *subsequent determination*, 426 F. App'x 498 (9th Cir. 2011).

## V.     CONCLUSION

Plaintiffs' testimony establishes that the collective mechanism is infeasible here. While all Team Leads were properly classified as exempt, making this determination requires an examination into each Team Lead's individual job duties. Based on Plaintiffs' own testimony, there is a wide spectrum of job duties to be considered to determine whether Plaintiffs were properly classified. For example, at one end, Plaintiffs Norgren and Fagen testified that they performed the same job duties as CSRs and that they did not use independent judgment or discretion in their duties. On the other end of the spectrum,

---

a Team Lead. Facilities specialists also performed many of the same duties as a Team Lead. [Urciuoli Dep. at 72:12-73:21, Ex. 10.]

Plaintiffs Morse and Urciuoli supervised CSRs and testified that they had to use discretion and independent judgment in various duties that had a significant impact on Vixxo's customers. Other Plaintiffs' duties fall along the spectrum, with some clearly performing duties that required the exercise of discretion and independent judgment while others, if their testimony is believed, performed fewer such duties.

Resolution of Plaintiffs' claims will require the Court or the jury to analyze the different job duties of each individual opt-in Plaintiff to determine whether he or she was properly classified as exempt. Therefore, the collective mechanism is infeasible, and Defendants respectfully request that the collective be decertified.

DATED this 8th day of February 2019.

                OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

                By:   s/ Douglas (Trey) Lynn
                      Tracy A. Miller
                      Douglas (Trey) Lynn
                      2415 East Camelback Road, Suite 800
                      Phoenix, AZ 85016
                      Attorneys for Defendant